Whitaker, Judge,
delivered the opinion of the court:
Plaintiff, holding the permanent rant of major and the temporary rant of colonel in the Air Force, sues for his pay from October 15, 1953, the date of his discharge, on the ground that his resignation from the Air Force, on the basis of which he was discharged was a nullity, because he was insane at the time he resigned. He was discharged under conditions other than honorable.
On June 28,1954, a little over 8 months after his discharge, plaintiff’s wife, on his behalf, filed an application with the Board for the Correction of Military Records to set aside his discharge on the ground her husband was insane when he submitted his resignation. The Board ruled adversely on her application, one member of the three-member board dissenting.
As the case comes to us it is in quite a different posture from what it was when it was first presented to the Secretary of the Air Force, and later to the Board for Correction of Military Records. Before the Secretary decided to accept the resignation, he first had to determine the question of plaintiff’s sanity, about which there was a question. He made his determination upon the basis of all the evidence pro and con, unembarrassed by any prior determination. He had before him, of course, the opinions of his subordinates, but he was not bound by them. When the matter came before the Correction Board, it was not bound by the Secretary’s prior determination, although we suppose it treats that determination as prima facie correct. But when the case comes before us, after the Secretary has approved the findings of the Correction Board, we are bound by the prior determinations, unless they were not supported by substantial evidence, or, for some other reason, were shown to be arbitrary or capricious.
This is because Congress has vested in the Secretary, acting for the President, the power to discharge officers under the conditions laid down. It has not vested that authority in "this court. Hence, we can give a discharged officer relief only in case the Secretary has abused the authority granted him by acting arbitrarily or capriciously.
*410 In this case plaintiff alleges there was no substantial evidence to support the actions of the Correction Board and the Secretary. There is no other allegation to support the charge of arbitrary or capricious action. The question presented to us, therefore, is, was there substantial evidence that plaintiff was sane when he submitted his resignation. If there was, we can give him no relief.
At the time plaintiff submitted his resignation he was Deputy Wing Commander of the 3904-th Wing, Strategic Air Command, Stead Air Force Base, Reno, Nevada. The genesis of the trouble that led to his resignation grew out of a project to hold stock car races at the base for the benefit of the base’s welfare fund. Plaintiff had been made project manager of this project. To cover preliminary expenses of the project, the Chamber of Commerce, at plaintiff’s suggestion, loaned plaintiff $4,000, to be repaid out of the gate receipts.
Plaintiff did not disclose this transaction to anyone. On the same day he cashed the check of the Chamber of Commerce, he deposited $3,000 in $100 bills to his account in the bank, and on the same day, or shortly thereafter, paid his personal notes at the bank amounting to $2,500. Until the $3,000 deposit was made, he did not have funds in his account sufficient to pay these notes.
Later, plaintiff’s commanding officer learned of the loan to plaintiff and called on him to immediately return the money. Upon plaintiff’s failure to comply, he was relieved of duty and an official investigation was ordered.
Plaintiff made a statement to the Inspector General of the 15th Air Force to the effect that he had not used any of the money, but had put it in an envelope, which he put in a lock box in a bank in Maryland, where he had gone on vacation shortly after receiving the money from the Chamber of Commerce. The report of the Inspector General stated in conclusion that his investigation indicated that plaintiff had misappropriated the sum of $4,000.
Plaintiff’s commanding officer thought that the gravity oí* the charge, made in the report of the Inspector General demanded disciplinary action of some sort, and, in accordance with customary procedure in such cases, he ordered *411 plaintiff to the Travis Air Force Hospital for an evaluation of his mental condition.
He was there for a period of two weeks, during which he was examined by the psychiatric staff of the hospital and also by a civilian consultant psychiatrist, a Dr. Kelley, who was quite an eminent man in his field.
Dr. Kelley interviewed plaintiff on September 21, 1953. In his opinion there was no evidence of any psychotic process or brain damage which could explain plaintiff’s activities with regard to the borrowed money. Dr. Kelley, however, was of the opinion that at present plaintiff was suffering from “a reactive hysterical depression characterized by psychomotor retardation and a feeling that he had let all of his friends down.” He stated further that plaintiff “will clear with simple psychotherapeutic techniques relatively rapidly but I would be against returning him to immediate duty until his depression has sufficiently resolved so that he can think more coherently about his present status.” Dr. Baier, a colonel in the Medical Corps, examined plaintiff on the same day and his diagnosis was almost identical with that rendered by Dr. Kelley.
The doctor’s progress notes which were made during plaintiff’s hospitalization show a marked improvement in plaintiff’s condition after September 21. Dr. Baier stated in the notes on October 2,1953, the following:
Pt. is entirely well & normal. No depression, etc. Is not the least confused. Is happy about his hospitalization & content to face life anew. In fact happy over his future plans.
Dr. Solow, who was chief of the Neuropsychiatric Service at the hospital, reported to the medical board that the “depression” which was noted in the examination on September 21 had since abated. The doctor concluded that “at this time no psychosis or psychiatric illness exists.”
On September 30,1953, plaintiff was sent before a medical board. This board reported, “No evidence of psychosis or psychiatric illness. Patient is mentally competent to appear before any administrative board.” This report was signed by Colonel Baier, 1/Lt. Greenberg, and 1/Lt. Jampolsky, members of the board, and was approved by Colonel W. F. *412 DeWitt, who was the commanding officer at the hospital.
Plaintiff was discharged from the hospital on October 2, 1953.
On the day before he was discharged, he wrote his commanding officer stating that he wished to resign and hoped that his resignation could be accepted. However, on the same day this letter was written the Inspector General of the 15th Air Force interviewed plaintiff at the hospital, and advised him that the only resignation that could be accepted would be one for the good of the service, and that if plaintiff was willing to tender such a resignation, he would be given a discharge under conditions other than honorable. Colonel Netcher, the Inspector General, had come to the hospital with such a resignation already prepared, and presented it to plaintiff for his signature. After some further discussion of the consequences of the submission of such a resignation, plaintiff signed it and gave it to Colonel Netcher.
Plaintiff’s commanding officer transmitted plaintiff’s resignation with the recommendation that it be accepted and that he be discharged under conditions other than honorable. This went through military channels to the Secretary of the Air Force, who approved it, and plaintiff was discharged on October 15, 1953.
In January 1954, some three months after his discharge, he first consulted a civilian psychiatrist by the name of Frank Caprio, and later in April 1954 he consulted a Dr. Albert Marland, another psychiatrist. Both of the physicians observed and treated plaintiff over some considerable period. Both of these gentlemen testified before the Correction Board that, from their observation of plaintiff, they were of the opinion that he could not have been sane at the time he submitted his resignation on the first of October of the previous year.
All of the foregoing testimony was before the Correction Board, and also a statement by plaintiff’s wife. Upon consideration thereof, the majority of the Correction Board concluded that no injustice had been done plaintiff by the acceptance of his resignation because they were of opinion that he was sane at the time he tendered it. The member of the board who dissented said this, among other things:
*413 It is not contended in this minority report that Colonel Stampados was insane at the time he signed his letter of resignation. In this matter the writer concurs with the Surgeon General that it is impossible at this time to determine whether Colonel Stampados was sane or insane on October 2,1953.[1]
Because of this doubt in his mind, he thought the discharge should be set aside.
All of these witnesses testified before a Trial Commissioner of this court, as well as quite a number of lay witnesses, and certain doctors who are not psychiatrists. The Trial Commissioner reports that there is substantial evidence that plaintiff was sane at the time he submitted his resignation.
From this recitation of the evidence, it is obvious that we cannot say that there was no substantial evidence to support the action of the Correction Board and that of the Secretary approving that action. This being true, we can grant plaintiff no relief. His petition will be dismissed.
It is so ordered.
LittletoN, Judge, {Bet.); LaRamoee, Judge; Maddest, Judge; and Jones, Chief Judge, concur.
FINDINGS OP PACT
The Court, having considered the evidence, the report of Trial Commissioner Currell Yance, and the briefs and argument of counsel, makes findings of fact as follows:
1. Plaintiff was born March 25, 1912, in Athens, Greece. He became a citizen of the United States by naturalization on July 16, 1943, before the District Court for the District of Columbia. He was appointed first lieutenant, temporary, Army of the United States, on July 3, 1943. He entered upon active duty as such July 6, 1943. At the time of his appointment, he was employed by the United States Government as chief, Geographic Intelligence, Office of Strategic Services. He was given a permanent appointment in *414 the Begular Air Force in the grade of captain on June 19, 1947. During his continuous active service, between 1943 and the date of his discharge, October 15,1953, he was promoted successively through the intervening grades to temporary colonel, January 19, 1951, and to permanent major, TJSAF.
2. During his period of active service, the plaintiff had the following duty assignments: Chief of Intelligence Operations, Office of Strategic Services; Chief of Air Section, OSS; Plans and Intelligence Officer (all the above assignments were overseas) ; Base Intelligence Officer; A-2 Chief of Exploration Section, Office of the Assistant Secretary of War; Chief Evasion and Escape Branch, Strategic Air Command; Commandant, School for Survival, Camp Carson, Colorado; and Deputy Wing Commander, Stead Air Force Base, Eeno, Nevada.
3. During the plaintiff’s period of active service, his efficiency ratings were as follows:
July 1943 through November 1948: Superior.
December 1948 through April 1952: 4.44 (average) of a possible 5.00.
May 1952 through April 1953: Middle third.
May 1953 to October 1953: Unsatisfactory.
4. During his period of active service, plaintiff received the following awards and decorations:
Legion of Merit — for period Dec 43 to Aug 44.
Bronze Star Medal — for period Apr 45 to Aug 45.
Army Commendation Bibbon for services w/OSS Dec 41 to Dec 42.
Oak Leaf Cluster to Commendation Bibbon for services with OSS from Jan 43 to Jul 43.
5 Battle Stars earned during WWII.
Berlin Airlift Device for Humane Action.
Foreign Decorations: Ouissam Alouite, rank of Officer, Moroccan Govt.
5. Plaintiff was a highly intelligent and well educated man. He had had considerable experience behind enemy lines during World War II, and had made a study of escape and survival techniques. He had been instrumental in instituting the School of Escape and Survival, of which he was originally placed in command, and he had arranged and im *415 plemented its course of study and training. With all plaintiff’s desirable qualities be had some unfortunate traits. He was somewhat arrogant and intolerant. At the same time he was considered to be bombastic and boastful as to his experiences, of doubtful veracity, particularly in the stories of his exploits and lofty connections, and somewhat careless in money matters.
6. Plaintiff was a hard worker, and applied himself diligently to the development and conduct of the school of survival, both at Camp Carson, where the school was started, and at Camp Stead, near Eeno, Nevada, to which it was moved.
His diligence and constant application brought on a nervous condition during 1951, for which the camp surgeon treated him and prescribed certain sedatives at times.
At the beginning of plaintiff’s connection with the survival school, his commanding officer was Col. William C. Kingsbury. Colonel Kingsbury, while realizing that plaintiff had certain flaws in character traits, knew how to get along with him and bring out his best efforts. In October 1952 Colonel Kingsbury was succeeded by Col. Clifford J. Heflin. There is more than a suggestion in the record that plaintiff and Colonel Heflin were not entirely compatible. Apparently Colonel Heflin did not have the patience of Colonel Kingsbury in dealing with plaintiff, and plaintiff seems to have more or less resented Colonel Heflin’s attitude toward him. This situation no doubt increased the tension under which plaintiff was working..
7. Early in 1958 a plan was originated to hold stock car races at Stead Air Force base to raise funds for the welfare fund. These races were to be run under the joint auspices of the men at the base and the Eeno Chamber of Commerce. Plaintiff was made project manager for the base but was directed to operate in his individual capacity rather than under his official rank, since the operation was not to be an official military operation.
8. Certain advertising and publicity was to be handled by the Eeno Chamber of Commerce, and the base personnel were to handle the operation of the event. Certain preliminary expenses had to be met, and there was no money in *416 the welfare fund for this purpose. There was a revolving fund to help in this matter, but other bases had first call upon it, and Stead could not anticipate receiving help from this source until after the conclusion of the races to be held at another post ahead of those at Stead. In this situation Stampados suggested to the Reno Chamber of Commerce that it make a loan to cover preliminary expenses, and he secured a loan of $4,000 for this purpose on his personal note. The proceeds of this note were not turned in to the stock car committee at Stead nor reported to anyone connected therewith, so far as is shown.
9. About the middle of September it came to Colonel Heflin’s attention by word from the Reno Chamber of Commerce that plaintiff had obtained $4,000 for the ostensible use of preparation for the stock car races, and he learned further, had not turned it over to the committee at the base nor reported it. Thereupon he called plaintiff in, demanded an immediate return of the money, and when plaintiff was unable to comply, relieved him of duty and asked for an official investigation.
10. An investigation was instituted by the Inspector General of the Strategic Air Command, and the fact of the loan was verified. Plaintiff was called upon for the customary statement and he made a statement under oath. In substance plaintiff said in his statement that he thought it best not to place the money in his account or publicize the loan, and consequently he cashed the check, put the proceeds in an envelope and placed the envelope in a safe deposit box in a bank in Maryland, where he went on a trip shortly after cashing the check. He stated that he had not used any of the money, that it was still intact, and that it would be available as soon as he could get it from the lock box in Maryland. In his report to his commanding officer, the Inspector General, Colonel Thomas G. Netcher, stated that “the evidence indicates that Colonel Stampados misappropriated the sum of $4,000.”[2]
*417 11. On September 17,1953, plaintiff was ordered to the Air Force hospital at Travis for evaluation of his mental condition and treatment if necessary. There was at Travis a complete staff of psychiatrists, a competent psychologist, and an eminently qualified civil consultant in psychiatry, all of whom examined plaintiff over a period of about 2 weeks.
12. On September 21, 1953, plaintiff was examined by Dr. Douglas M. Kelley, a civilian consultant in psychiatry, who gave the following diagnosis:
The historical data and psychological examinations together with the interview, would appear that Colonel Stampados at the time of the alleged appropriation of funds, knew the nature and consequences of his action, was aware of the regulations against such procedure, and knew that the activities in borrowing money from civilians would be considered technically wrong. There is nothing to indicate any psychotic process or organic brain damage which could be offered as an explanation of his behavior, nor is there any suggestion medically that his mental capacity at the time of the events was reduced in any way.
At present theie seems no doubt that he is suffering from a reactive hysterical depression characterized by psychomotor retardation and a feeling that he has let all of his friends down. As a result of the depression, he feels the only course is resignation, and it is my impression that this is his way of attempting to atone for the deep guilt feelings which have developed.
The psychiatric examination suggest~ that his basic personality is that of a self-centered, creative, imaginative, ambitious individual whose reactions will be cha.rac-terized by impulsive, uncontrolled activities directed solely at achieving the goal and paying little attention to the usual methods required. Such impulsivity, it would be expected, would get him into trouble with any organizational structure and his history shows that at least on a previous occasion, probably others, he has had this prob1~m. His seif-centeredness and his impulsivity, und5uhtedly have gotten him into trouble with his subordinates and while such characteristics make for difficult disciplinary problems, his creative ability should be considered in that these individuals are the ones who actually produce results although at times their methods seem objectionable to individuals bound to routine tech- *418 ñiques. _ It is my impression that this individual will clear with simple psychotherapeutic techniques relatively rapidly but I would be against returning him to immediate duty until his depression has sufficiently resolved so that he can think more coherently about his present status.
13. Dr. George F. Baier, a colonel in the Medical Corps, on the same day, September 21,1953, gave an almost identical diagnosis after examining plaintiff. His conclusions, in part, were as follows:
* * Patient knows right from wrong. The present situation (the stress created by the newspaper publicity and the reprimand of his previous commander) is beginning to drive the patient into a state of acute anxiety with slight hysterical suggestions. It is believed that this reaction is normal considering the mental stress and especially because of previous “trouble” which the patient has had as a result of his dynamic impulsive personality.
Certainly there was no mental disease, nor even any evidence of decreased mental capacity at the time of his alleged appropriation of money from the chamber of commerce in Heno. Certainly at that time he knew what he was doing and that it was technically wrong. However, his impulsiveness to do something which action he felt was morally right resulted in the step that he took.
His current depression has resulted in a strong feeling of guilt and mental retardation. He feels that his only course is resignation from the service, this is his way of atoning for his deep guilt feeling. Actually, it is his method of raising his own ego by developing in himself a pride of giving up that which he wants most, namely his commission and career in the Air Force. His current guilt feeling is so extreme that along with his confusion, which has placed him now in a state where he is willing, to sacrifice even his most precious desires and possessions. He is therefore in no frame of mind to act with normal judgment.
. The basic personality of the patient is that of an egotist combined with a strongly imaginative and ambitious character. His reaction behavior is strongly impulsive and directed solely at achieving a goal, disregarding normal or rightful techniques and methods. This combination invariably leads to trouble in any organization. He is the type.of person therefore that gets results — but also creates animosities in so doing.
*419 14. The doctor’s progress notes show a continued improvement in plaintiff’s condition after September 21. The nursing notes which were also kept show many complaints by plaintiff, but none of these complaints were reflected in the doctor’s notes. The final notation on the doctor’s progress notes, dated October 2, 1953, and signed by Colonel Baier, reads as follows:
Pt. is entirely well & normal. No depression, etc. Is not the least confused. Is happy about his hospitalization & content to face life anew. Is in fact happy over his future plans.
15. On September 30, plaintiff appeared before a medical disposition board composed of three medical officers which found “no evidence of psychosis or psychiatric illness. Patient is mentally competent to appear before any administrative board.” Dr. Robert A. Solow, who was Chief of the Neuropsychiatric Service at the hospital, reported to the board, in part, as follows:
On 21 September 1953 the patient was examined by the Neuropsychiatric Service, the Chief of Professional Services, with Dr. Douglas M. Kelley, Civilian Consultant in Neuropsychiatry, in consultation. After study and analysis of the history, psychiatric and psychological examinations, and after examining, and interviewing the patient, it was the unanimous opinion of the physicians that:
a. — The Patient’s basic self-centered, ambitious personality with his impulsive, uncontrolled behavior, lead to the situation which brought about his hospitalization for psychiatric evaluation.
b. — It was the worry over the current situation that led to the depression and deep guilt feeling following hospitalization.
c. — Colonel Stampados at the time of the alleged appropriation of funds knew the nature and consequences of his action, was aware of the regulations against such procedure, and knew that the activities in borrowing money from civilians would be considered technically wrong.
There is nothing to indicate any psychotic process, or organic brain pathology, nor is there any suggestion medically that the patient’s mental capacity at the time of the alleged misconduct was reduced in any way.
*420 Following the psychiatric interview and examination, and with psychotherapeutic techniques, the depression abated.
At this time no psychosis or psychiatric illness exists. The patient can be discharged to full duty. The patient is mentally competent to appear before any administrative board.
DIAGNOSIS: No disease found.
Plaintiff was discharged from the hospital on October 2, 1958.
16. On October 1, 1953, plaintiff wrote a letter to Major General W. J. Sweeney, Commander, 15th Air Force, in which he stated:
As I will be discharged from the hospital in a few days wherein I have taken inventory my past, the present and the future and in the process I found a new relationship with the God of my fathers. In consideration of my past honorable record in the Air Force and my contributions as a whole, I respectfully request that I be permitted to tender my resignation from the service.
Since my admission in the hospital I have had the opportunity of analyzing myself quietly and find that during the past year or so I developed an emotional instability because of conditions prevailing in my family and the continuous frustration created by the instability of the 3904th Composite Wing. I stayed too long in the organization and its problems became my own and coupled with my own precipitated unreasonable actions.
I feel that in tendering my resignation it will allow the 3904th which I was partially instrumental in creating an opportunity to settle down. There are personal and other reasons which I request the privilege of submitting to you verbally at your convenience.
17. On the same day, October 1, plaintiff was visited at the hospital by Colonel Thomas G. Netcher, Inspector General, 15th Air Force, who brought him a letter of resignation for his signature by which plaintiff would resign for the good of the service under conditions other than honorable. The letter read as follows:
1 October 1953
SUBJECT: Tender of Resignation
TO: Director of Military Personnel
Headquarters United States Air Force Washington 25, D.C.
*421 1. I, Demetrius G. Stampados, Colonel USAF, 5479A, under the provisions of par 7a, AFR 36-12, 28 Feb 52, hereby voluntarily tender my resignation from the Air Force for the good of the service.
2. I understand that this resignation, if accepted, will terminate all commissions held by me at this time and that I will be discharged under conditions other than honorable.
3. I understand that I will not be entitled to mustering out pay or accrued leave.
4. I understand that I will be barred from all rights based upon the period of service from which I will be separated by acceptance of this resignation, under any laws administered by the Veterans Administration, except that this provision does not apply to any war risk, Government (converted), or National Service Life Insurance policy.
5. I am not accountable or responsible for public property or funds.
6. I have been afforded the opportunity of consulting legal counsel regarding the advisability of submitting this resignation.
DEMETRIUS G. STAMPADOS, 5479A Colonel, USAF
Colonel Netcher told plaintiff that this was the only type of resignation which would be accepted. He explained its meaning and suggested that plaintiff seek the advice of legal counsel. After a discussion of approximately two hours, plaintiff signed the document.
18. Plaintiff’s resignation was accepted by the Secretary of the Air Force on October 8, 1953. He was subsequently discharged on October 15, 1953.
19. After his discharge from the service, beginning in January 1954, plaintiff was examined and treated by Dr. Frank Caprio, a psychiatrist and psychoanalyst. Later, beginning in April 1954, plaintiff was further examined and treated by Dr. Albert E. Marland, a psychiatrist. Both of these doctors testified that as of October 1,1953, plaintiff was suffering from a psychosis and was not legally responsible for his actions.
20. Several months after plaintiff’s discharge, his wife, Mrs. Susan C. Stampados, filed a petition before the Air Force Board for the Correction of Military Records, seeking *422 to annul plaintiff’s discharge under conditions other than honorable, and all subsequent events dependent thereon. A full hearing into the matter was conducted by the board. Plaintiff was represented by counsel, and the testimony of witnesses was heard, and plaintiff’s military and medical records examined. On the basis of such hearing the board found that there was no error in plaintiff’s discharge; that he was mentally competent at the time, and the petition for correction was dismissed.
One member of the 3-member board filed a minority opinion. In the third paragraph of such minority opinion appears the following:
It is not contended in this minority report that Colonel Stampados was insane at the time he signed his letter of resignation. In this matter the writer concurs with the Surgeon General that it is impossible at this time to determine whether Colonel Stampados was sane or insane on October 2,1953.
CONCLUSION OP LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiff is not entitled to recover, and his petition is therefore dismissed.

 The Correction Board Rad asked the Surgeon General’s opinion ■with respect to plaintiff’s sanity. The Surgeon General had reported that from the records in his file it was impossible for him to give an opinion thereon, but stated that Dr. Kelley was one of the most eminent psychiatrists, and presumably based upon his testimony, the Surgeon General expressed the opinion that plaintiff was probably sane at the time.

 The proof presented at the trial in this court is conclusive that plaintiff did use some of the money borrowed to pay off a personal note, and that the statement about putting the proceeds of the check in an envelope in a lock box in Maryland is wholly fictitious.